# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MEDICOR, LTD., et al., | : | Case No. 07-10877 (MFW) |
| | : | |
| Debtors. | : | |
| | : | |
| Larry L. Bertsch, as court-appointed receiver of Southwest Exchange, Inc., et al., | : | Adversary Proceeding No. _____ |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MediCor, Ltd., | : | |
| Silver Oak Capital, LLC, | : | |
| HFTP Investment, LLC, | : | |
| Promethean I Master, Ltd, | : | |
| Promethean II Master, LP, and | : | |
| Portside Growth and Opportunity Fund, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT (1) TO DETERMINE VALIDITY AND EXTENT OF LENDERS' ALLEGED LIENS IN ALLEGED INTERCOMPANY LOAN CONTRACT AND INTERCOMPANY RECEIVABLE, (2) TO DETERMINE VALUE OF LENDERS' ALLEGED LIENS IN ALLEGED INTERCOMPANY LOAN CONTRACT AND INTERCOMPANY RECEIVABLE, (3) TO VOID LENDERS' ALLEGED LIENS IN ALLEGED INTERCOMPANY LOAN CONTRACT AND INTERCOMPANY RECEIVABLE; AND (4) FOR CIVIL CONSPIRACY TO CREATE FRAUDULENT INTERCOMPANY LOAN CONTRACT AND INTERCOMPANY RECEIVABLE**

Plaintiff Larry L. Bertsch, as court-appointed receiver (the "<u>Receiver</u>" or "<u>Plaintiff</u>") of

Southwest Exchange, Inc.("<u>Southwest</u>"), Blackstone Limited, LLC ("<u>Blackstone</u>"), International

Integrated Industries, LLC ("III"), and other entities,[1] by and through his undersigned counsel, for his complaint against MediCor, Ltd. ("MediCor"), one of the debtors in these chapter 11 cases; and Silver Oak Capital, LLC, HFTP Investment, LLC, Promethean I Master, Ltd (f/k/a GAIA Offshore Master Funds, Ltd), Promethean II Master, LP, Portside Growth and Opportunity Fund (collectively the "Lenders") which claim liens and security interests (collectively "liens") in and to an alleged intercompany loan contract and intercompany receivable owed to MediCor by its non-debtor, wholly-owned, French subsidiary ES Holdings SAS ( "ES Holdings"), alleges as follows:

## I. PARTIES

1.     Plaintiff is an individual who resides in Nevada. Plaintiff brings this action in his capacity as Receiver of Southwest, Blackstone, and other entities.

2.     By orders dated February 7, 2007, and May, 2007, of the District Court, Clark County, Nevada (the "Receivership Orders"), Plaintiff was appointed and continues to act as the Receiver for Southwest, Blackstone, III and other entities with full power, inter alia, to take custody and control over, conserve, protect and sue for, collect and take into possession all assets of Southwest and the other receivership entities. The Receivership Orders also charge Plaintiff with performing all other acts necessary or advisable to preserve the value of and prevent any irreparable loss, damage or injury to those assets, including obtaining an accounting. Among the assets that the Receiver is empowered to sue for, collect and take possession of are the tens of millions of dollars that Southwest held in trust for its clients and that was improperly misappropriated to pay for ES Holdings' acquisition of an entity known as Laboratories Eurosilicone SAS ("Eurosilicone").

---

[1] The other entities covered by the receivership are Sirius Capital, LLC, NexGen Management, Inc., Americade, LLC, Global Aviation Delaware, LLC, McGhan Development Corp., Global Asset Management, West Vegas, LP, Bianathar, LLC, Trinity Star Ventures, LLC, and Ventana Coast, LLC.

2

3. Two of the entities for which Plaintiff serves as Receiver – Sirius Capital, LLC and III – are listed by MediCor in its bankruptcy schedules as the largest unsecured creditors.

4. Defendant MediCor is a Delaware corporation. MediCor and its direct and indirect subsidiaries, including the other debtors, operate across multiple geographic locations within the United States and internationally. The debtors and their non-debtor subsidiaries are in the business of acquiring, developing, manufacturing, and selling products primarily for the aesthetic, plastic and reconstructive surgery and dermatology markets, including but not limited to breast implants.

5. Upon information and belief, Defendant Silver Oak Capital, LLC ("Silver Oak") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business located in the state of New York. Silver Oak is a hedge fund.

6. Upon information and belief, Defendant HFTP Investments, LLC ("HFTP") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business located in the state of New York. HFTP is a hedge fund.

7. Upon information and belief, Defendant Promethean I Master, Ltd f/k/a GAIA Offshore Master Fund, LTD ("Promethean I") is a business entity having an office in New York. Promethean I is a hedge fund.

8. Upon information and belief, Defendant Promethean II Master, LP ("Promethean II") is a business entity having an office in New York. Promethean II is a hedge fund.

9. Upon information and belief, Defendant Portside Growth and Opportunity Funds ("Portside") is a business entity having an office in New York. Portside is a hedge fund.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157, 11 U.S.C. §506(a) and (d), Rule 7001(2) of the Federal Rules of Bankruptcy Procedure. This proceeding arises under Title 11 of United States Code (the "Bankruptcy Code") and is related to these chapter 11 cases filed by MediCor and certain of its subsidiaries.

11. This is a core proceeding that the Court may hear and determine pursuant to 28 U.S.C. § 157(A), (K), and (O).

12. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13. This Court has personal jurisdiction over MediCor as a debtor in these chapter 11 cases, and the Lenders have sufficient contacts with the state of Delaware and the United States, including direct involvement in these chapter 11 cases, such that they are subject to the personal jurisdiction of this Court.

## III. FACTUAL BACKGROUND

14. One of the receivership entities is Southwest which collapsed in early 2007 under the weight of a massive Ponzi scheme perpetrated by Donald McGhan ("McGhan") and accomplices. Before its collapse, Southwest was engaged in the business of acting as a qualified intermediary for tax-deferred exchanges under 26 U.S.C. § 1031 and applicable state law. As such, Southwest was entrusted by its clients with tens of millions of dollars. Pursuant to the exchange agreement with each of its clients, Southwest was required to deposit and hold the proceeds from the sale of the client's property in "one or more financial institutions whose accounts are insured by the Federal Deposit Insurance Corporation" or as otherwise directed by

the client until needed to fund the client's purchase like-kind replacement property qualifying for tax deferral under Section 1031.

15. McGhan founded MediCor in 1999. McGhan signed on behalf of MediCor a definitive agreement to acquire (the "Acquisition Agreement") all of the stock in Eurosilicone for an initial purchase price (the "Initial Purchase Price") of €32,000,000 plus three annual subsequent year payments (the "Subsequent Payments") of up to €3,000,000 each depending upon a revenue formula. A copy of the Acquisition Agreement is attached hereto and incorporated herein as **EXHIBIT A**.

16. In early to mid June 2004, McGhan acquired Southwest. McGhan's daughter, Nikki Pomeroy ("Pomeroy"), became an officer of Southwest.

17. In late June and early July 2004 Pomeroy caused more than $37,000,000 being held by Southwest for its clients in a bank account at UBS to be wired to an account of Blackstone also at UBS. Southwest received nothing for the transferred funds except unsecured promissory notes from Blackstone. At the time, Blackstone was owned and controlled by McGhan. His wife Shirley ("Mrs. McGhan") and daughter Pomeroy were offices of Blackstone.

18. Blackstone was not a financial institution, and its accounts were not insured by the Federal Insurance Deposit Corporation. None of Southwest's clients directed that Southwest transfer the proceeds of their property sales to Blackstone.

19. Following wire instructions from Pomeroy and Mrs. McGhan, UBS transferred from Blackstone's account the $37,000,000 it had received from Southwest to the account of M. Francois Tourniaire ("Tourniaire") at Banque BNP Paribas in France. Tourniaire and other individuals were the owners of Eurosilicone's stock and the sellers under the Acquisition

5

Agreement with MediCor. The Acquisition Agreement designated Tourniaire as the Sellers' Representative with responsibility to receive the purchase price for the stock.

20. The wire instructions from Pomeroy and Mrs. McGhan expressly state that Blackstone's payments to Tourniaire are for acquisition funding per the Acquisition Agreement dated May 17, 2004.

21. Documents evidencing the movement of the $37,000,000 from Southwest to Blackstone and then from Blackstone to Tourniaire are attached hereto and incorporated herein as **EXHIBIT B**.

22. MediCor assigned its rights as Purchaser under the Acquisition Agreement to ES Holdings, and ES Holdings closed on the transaction and took title to the Eurosilicone stock. Apart from a deposit of €1,000,000 to €2,000,000 (the "Deposit"), the entire Initial Purchase Price of €32,000,000 was paid to Tourniaire by Blackstone using $37,000,000 of Southwest's money. ES Holdings paid none of the Initial Purchase Price. With the possible exception of the Deposit, MediCor paid none of the Initial Purchase Price.

23. Blackstone is now part of the receivership estate. Neither Blackstone nor Southwest received reasonably equivalent value for the $37,000,000. Even if Southwest was not holding its clients money in express or resulting trusts, the transfers to Blackstone violated Southwest's exchange agreements because Blackstone was not a "financial institution" and its accounts were not "insured by the Federal Deposit Insurance Corporation." The transfers of $37,000,000 from Southwest to Blackstone to Tourniaire were fraudulent and unjustly enriched ES Holdings and MediCor to the detriment and impoverishment of Blackstone and Southwest.

24. The misappropriation and diversion of Southwest's funds by Don McGhan and his accomplices resulted in a significant deficit in Southwest's cash needed to complete Section

1031 exchange transactions. Consequently, Don McGhan and Southwest used sale proceeds deposited by new clients to fund the purchases of replacement properties by existing clients, resulting in a Ponzi scheme that required new money to fund existing obligations.

25. Don McGhan and Southwest continued to advertise and solicit business for Southwest throughout the balance of 2004, 2005 and 2006 under the false premise that money entrusted by clients to Southwest would be deposited and held in accounts with financial institutions that were insured by the Federal Deposit Insurance Corporation and preserved until needed to complete their purchases of replacement properties.

26. Southwest finally ceased doing business in late 2006 or 2007 when it could no longer find the funds needed to prop up the Ponzi scheme.

27. The Receiver's damage claims for the $37,000,000 against ES Holdings and others are pled in detail in his amended complaint in Adversary Proceeding No. 07-10877 associated with these chapter 11 cases.

28. After McGhan misappropriated $37,000,000 from Southwest and its exchange clients and laundered it through Blackstone to pay for ES Holdings' acquisition of the Eurosilicone stock, he tried further to cover his tracks by making it appear that MediCor loaned ES Holdings the money to buy Eurosilicone.

29. McGhan and his associate and business partner, Theodore Maloney, caused MediCor and a yet-to-be-formed ES Holdings to make an intercompany loan contract ("Intercompany Loan Contract") purportedly on June 29, 2004, in which MediCor purportedly loans to ES Holdings, on an unsecured basis, the sum of €30,000,000 to finance the acquisition price of the Eurosilicone stock. By the express terms of the Intercompany Loan Contract, ES Holdings was to receive the loan from MediCor in the form of a single drawdown to be wired

7

directly to Tourniarie's bank account in the name and on behalf of ES Holdings. Attached hereto and incorporated herein as **EXHIBIT C** is what purports to be an English translation of the Intercompany Loan Contract that the Lenders furnished to the Receiver.

30. The Intercompany Loan Contract was merely a ruse, an artifice created by Don McGhan and his accomplices to cover up the true fact that the Eurosilicone stock was purchased with funds misappropriated from Southwest rather than with proceeds of a loan from MediCor to ES Holdings.

31. The €30,000,000 loan under the Intercompany Loan Contract was never made. ES Holdings did not use any loan proceeds from MediCor to pay for the Eurosilicone stock. Instead, the acquisition price of the Eurosilicone stock was financed by the Deposit and by the $37,000,000 that was misappropriated from Southwest and transferred to Blackstone and then transferred by Blackstone directly to the bank account of Tourniaire. The transfers from Blackstone to Tourniaire were not in the amount of €30,000,000, were not in a single drawdown, and were not wired to Tourniaire's bank account in the name of and on behalf of ES Holdings. Instead, Blackstone made three wire transfers to Tourniaire of $26,000,000 on June 30, 2004, $7,000,000 on July 1, 2004, and $4,000,000 on July 2, 2004.

32. Notwithstanding that the €30,000,000 loan by MediCor to ES Holdings was never funded, MediCor treated it as a real transaction and obligation on the part of its subsidiary. MediCor set up on its books a fraudulent note receivable allegedly owed by ES Holdings for the purchase of Eurosilicone (the "<u>Intercompany Receivable</u>").

33. The initial balance of the Intercompany Receivable was $39,332,356 on July 5, 2004. Upon information and belief, the initial balance of the Intercompany Receivable is the product of multiplying €30,000,000 by the then applicable currency exchange rate.

34. During the period from July 5, 2004, to the date MediCor filed its chapter 11 petition (the "Petition Date"), ES Holdings made substantial payments on the Intercompany Receivable.

35. MediCor represents in its bankruptcy schedules, specifically in Exhibit B-18 to Schedule B – Personal Property, that the balance of Intercompany Receivable on or about the Petition Date was $33,415,609.30.

36. On or about April 26, 2006, Lenders made a $50,000,000 loan to MediCor that was secured by certain assets and guaranteed by certain of MediCor's subsidiaries ("Guarantors"), not including ES Holdings or Eurosicilone. The terms of the security and guarantees are set forth in a Guarantee and Collateral Agreement including schedules and attachments (the "Collateral Agreement") dated April 26, 2006. A copy of the Collateral Agreement is attached hereto and incorporated herein as **EXHIBIT D**.

37. Lenders assert a first priority, valid, enforceable, perfected lien in the Intercompany Loan Contract and Intercompany Receivable. Lenders claim that MediCor granted them a lien in the Intercompany Loan Contract and Intercompany Receivable through the Collateral Agreement. Upon information and belief, the only document that Lenders contend grants them a security interest in the Intercompany Loan Contract and Intercompany Receivable is the Collateral Agreement.

38. Neither the Intercompany Loan Contract nor the Intercompany Receivable is identified in the Collateral Agreement as part of the collateral (the "Collateral") securing the Lenders. No intercompany loan contract or intercompany receivable of any kind is identified in the Collateral Agreement as part of the Collateral.

39. The Collateral does include "Pledged Debt" which is defined in the Collateral Agreement to include all Promissory Notes and debt Securities issued to or held by MediCor and the Guarantors (collectively the "Pledgors") including, but not limited to, those listed in Schedule 4.5 thereto.

40. MediCor and each of the Pledgors represent and warrant in Section 4.5(a) of the Collateral Agreement that Schedule 4.5 sets forth a complete and accurate list of all Pledged Debt and debt Securities held by the Pledgors as of April 26, 2006. Schedule 4.5 lists a number of different debt Securities, but shows "none" for Pledged Debt.

41. Neither the Intercompany Loan Contract nor the Intercompany Receivable fits within any of the categories of Collateral described in the Collateral Agreement.

42. MediCor did not intend the Collateral Agreement to grant the Lenders a security interest or lien in the Intercompany the Loan Contract or the Intercompany Receivable.

43. Lenders did not understand or believe that the Collateral Agreement granted them a security interest or lien in the Intercompany Loan Contract or the Intercompany Receivable.

44. MediCor, the Guarantors, and Lenders did not intend that any intercompany loan contract or intercompany receivable be included in the Collateral securing the Lenders.

45. MediCor and Lenders never contended that the Intercompany Loan Contract or Intercompany Receivable was part of the Collateral securing the Lenders until after the Petition Date.

46. Even if MediCor had intended to grant a lien in the Intercompany Loan Contract and/or Intercompany Receivable and the Lenders understood or believed that they were being granted a lien therein, said lien would be void because of the fraudulent nature of the Intercompany Loan Contract and Intercompany Lien.

47. By the time it entered into the Collateral Agreement in April 2006, MediCor still had failed to provide ES Holdings with any consideration for the Intercompany Loan Contract and Intercompany Receivable.

48. At the time of the Collateral Agreement, the Intercompany Loan Contract and the Intercompany Receivable were void for MediCor's failure to provide any consideration to ES Holdings for its purported obligation thereunder.

49. Lenders made certain prepetition loans to ES Holdings totaling $3,500,000. Lenders also made certain postpetition loans to or for the benefit of ES Holdings under the DIP Financing Facility. Lenders' prepetition and postpetition loans to ES Holdings (the "ES Holdings Loans") are not secured by any assets of ES Holdings. Thus, with respect to their claims against ES Holdings, both the Receiver and the Lenders are unsecured creditors.

50. The Court has recently approved the sale of certain assets of MediCor and its non-debtor subsidiaries, including ES Holdings' sale of the Eurosilicone stock for $38,000,000. Over the Receiver's objection, the Court has ordered that part of the Eurosilicone stock sale proceeds be used to pay the Lenders' unsecured claims against ES Holdings arising from the ES Holdings Loans.

51. The Court has also ordered that approximately $20,000,000 of the Eurosilicone stock sale proceeds be held in escrow by Debtors' counsel pending a determination of the Receiver's claims against ES Holdings and a determination of the Lenders' alleged lien in the Intercompany Loan Contract and Intercompany Receivable that allegedly represent an unsecured obligation owed by ES Holdings to MediCor.

## IV. CLAIMS

## COUNT I

**(Claim to Determine Validity and Extent of Lenders' Alleged Liens in Intercompany Loan Contract and Intercompany Receivable)**

52. Plaintiff repeats and re-alleges the allegations set forth in paragraph 1 through 51 above, as if fully set forth herein.

53. Pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, Plaintiff requests the Court to determine the Lenders' alleged liens in the Intercompany Loan Contract and Intercompany Receivable are invalid because the Intercompany Loan Contract and the Intercompany Receivable are fraudulent and do not represent true, lawful obligations of ES Holdings to MediCor.

54. Pursuant to Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, Plaintiff requests the Court to determine that Lenders' alleged liens in MediCor's assets do not extend to the Loan Contract and the Intercompany Receivable because (a) they constitute fraudulent obligations of ES Holdings and fraudulent assets of MediCor, (b) the Loan Contract and the Intercompany Receivable are not included within the categories of Collateral granted to the Lenders under the Collateral Agreement, (c) MediCor and other Pledgors never intended the Collateral Agreement to grant a lien to the Lenders in any intercompany loan contract or intercompany receivable and the Lenders never understood or believed that the Collateral Agreement granted them a lien in any intercompany loan contract or intercompany receivable, and (d) MediCor never intended the Collateral Agreement to grant a lien to the Lenders in the Intercompany Loan Contract or Intercompany Receivable and the Lenders never understood or believed that the Collateral Agreement granted them a lien in the Intercompany Loan Contract or Intercompany Receivable.

## COUNT II

### (Claim to Determine the Value of Lenders' Alleged Liens in Intercompany Loan Contract and Intercompany Receivable)

55. Plaintiff repeats and re-alleges the allegations set forth in paragraph 1 through 54 above, as if fully set forth herein.

56. Pursuant to Section 506(a) of the Bankruptcy Court, Plaintiff requests the Court to value any lien that Lenders might have in the Intercompany Loan Contract and Intercompany Receivable at zero.

## COUNT III

### (Claim to Void Lenders' Alleged Liens in Intercompany Loan Contract and Intercompany Receivable)

57. Plaintiff repeats and re-alleges the allegations set forth in paragraph 1 through 56 above, as if fully set forth herein.

58. Pursuant to Section 506(d), Plaintiff requests the Court to void any lien that Lenders might have in the Intercompany Loan Contract and Intercompany Receivable.

## COUNT IV

### (Claim of civil conspiracy against MediCor)

59. Plaintiff repeats and re-alleges the allegations set forth in paragraph 1 through 58 above, as if fully set forth herein.

60. Upon information and belief, MediCor and ES Holdings entered into an agreement to create a fictitious loan document (to wit, the Loan Contract) in an effort to place the proceeds embezzled from Southwest further outside the reach of Plaintiff and to create the appearance of a legitimate obligation owed by ES Holdings to MediCor so as to upstream money from ES Holdings to MediCor.

61. Such actions were unlawful and/or were legal action done in an unlawful manner.

62. As a direct and proximate result of the conspiracy between MediCor and ES Holdings, Plaintiff has suffer damages of at least $37,000,000 for which MediCor is liable.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Larry L. Bertsch, as court-appointed Receiver of Southwest, Blackstone, III and other entities, prays for judgment that:

A. Lenders' alleged liens in the Intercompany Loan Contract and Intercompany Receivable are invalid;

B. Lenders' liens in MediCor's assets do not extend to the Intercompany Loan Contract or Intercompany Receivable;

C. Any liens Lenders might have in the Intercompany Loan Contract and Intercompany Receivable are of no value;

D. Any liens Lenders might have in the Intercompany Loan Contract and Intercompany Receivables are void;

E. MediCor and ES Holdings are guilty of a civil conspiracy aimed at the interests represented by the Receiver, and awarding damages thereupon to Plaintiff in an amount not less than $37,000,000;

F. For an award of attorneys' fees and other costs as permitted by law; and

G. For such other and further relief as this Court deems just and proper under the circumstances.

Dated: April 18, 2008

**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**

By:_____/s/ Francis A. Monaco Jr._____
    Francis A. Monaco, Jr. (Del Bar No. 2078)
    Kevin J. Mangan (Del Bar No. 3810)
    222 Delaware Avenue, Suite 1501
    Wilmington, DE 19801
    Tel.: (302) 252-4363
    Fax: (302) 661-7728

    William B. Sullivan (NC Bar No. 17758)
    Philip J. Mohr (NC Bar No. 24427)
    One West Fourth Street
    Winston-Salem, NC 27101
    Tel.: (336) 721-3506
    Fax: (336) 733-8365

    Attorneys for Plaintiff